UNITED STATES, Appellee

v

SYLVESTER T. HUNDLEY, Private First Class,
U. S. Marine Corps., Appellant

21 USCMA 320, 45 CMR 94

No. 24,538

April 21, 1972

*Captain F. G. Schonenberg, Jr.,* USMCR, argued the cause for Appellant, Accused. With him on the brief was *Major L. K. O'Drudy, Jr.,* USMC.

*Lieutenant James B. Ginty,* JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.,* JAGC, USN.

### Opinion of the Court

DARDEN, Chief Judge:

An interracial conflict involving physical violence at Camp Lejeune, North Carolina, on July 20, 1969, had as one of its results a general court-martial conviction of Private First Class Hundley on charges of rioting, assault, and involuntary manslaughter. The court found him not guilty of three other assault specifications; the involuntary manslaughter conviction was found as a lesser included offense of unpremeditated murder. The sentence that consists of a dishonorable

discharge, total forfeitures, confinement at hard labor for nine years, and reduction to the lowest pay grade is unchanged after earlier appellate review. We granted review to consider three issues relating to two confessions, the warning that preceded the first, and testimony by the appellant.

During preliminary investigation of the racial disturbance that occurred at Camp Lejeune, Staff Sergeant Luttrell, an investigator for the Criminal Investigations Division, obtained two statements from a Private Hamilton to the effect that Hamilton had been told by Hundley that Hundley hit somebody on the head with a log. A Private Short had indicated that he had seen appellant Hundley in the crowd outside the mess hall where a man had been assaulted. To interview Hundley, Sergeant Luttrell caused him to report to the CID office on July 22. With a Sergeant McNaney as a witness, Sergeant Luttrell gave the appellant the full warnings that Article 31, Uniform Code of Military Justice, 10 USC § 831, and this Court's decision in United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967), require, after which Hundley signed a waiver and consented to the interview. At first he denied all knowledge of and involvement in the events of July 20. Then Sergeant Luttrell told him "if he was not involved; if he was completely free of the whole incident, and he was aware of people that were involved, that he could be held responsible for withholding this information, if he was interfering with the investigation. That didn't apply if he was involved in it." On further cross-examination Sergeant Luttrell testified that he was not sure of the detail but did explain to Hundley that "if he was not involved, then he could be held responsible." On redirect examination Sergeant Luttrell was questioned by the trial counsel as follows:

"Q. Now, if you said that—as I recall, you made a statement, 'If you are not involved, and you know that

you have information and you withhold it, you will be held responsible', and then you say, 'this does not apply to you if you're a suspect', is that correct?

"A. Well, I'm not sure if I actually put that on the end of it or not, sir. I can't remember.

"Q. Did you mean—if you said—did you mean—what was your intent?

"A. My intention was to have let him understand that he's considered himself a suspect when he sat down in my chair, and then at that one point when he denied any involvement, I wanted him to understand if he wasn't involved, the situation was like this; and I still wanted him to understand that if not, he still was considered a suspect and that . . .

"Q. And all that you had previously stated to him still applied?

"A. Yes, still applied; and then we were going from the status of suspect to if; then I gave him this one set sentence, 'If you are not involved', and then I cut it right there.

"Q. And indicated that did not apply to any suspect?

"A. Leaving him the impression that he was a suspect unless he was not involved; that was my intention.

"Q. Did the accused seem to indicate that he understood that?

"A. Yes, sir, he did."

After this advice and a resumption of questioning, Hundley acknowledged his involvement and signed a written statement. He admitted that on the night of July 20 he had been with a group of about 60 black Marines, that he had used a broom handle to hit one white Marine who had been outside a phone booth, and that later he knocked another white Marine down by hitting him over the head with a "club."[1]

At the trial the military judge denied a motion to suppress the confession on the alleged grounds that Hund-

---

[1] In a second pretrial statement three days later this was described as "a tree branch about three foot long and as big around as an orange."

ley was improperly warned about his right to remain silent regarding the offenses of which he was suspected. When he admitted the confession for consideration by the military jury, the judge instructed them, among other things, that:

". . . [U]nless you are convinced beyond a reasonable doubt —that the statement of Staff Sergeant LUTTRELL, to the effect, that if the accused was not involved with the incident, that he, Staff Sergeant LUTTRELL, was investigating, and that if he, the accused, had information that he, the accused, would be held responsible, if he did not reveal information—that that statement of LUTTRELL did not result in the accused making his subsequent statement, you may not consider the accused's subsequent statement, since it would then be involuntary. In other words, gentlemen, . . . if that particular statement by Staff Sergeant LUTTRELL operated in any way to deprive the accused of the free exercise of his will in making this statement or not making a statement, then you may not consider the accused's subsequent statement."

The judge repeated similar instructions before findings.

This Court's opinions often have declared that for a confession to be admissible in military trials, two conditions must be met: (1) the suspect must have been properly warned, and (2) the confession must have been voluntary.

As the instruction quoted above demonstrates, the military judge treated Sergeant Luttrell's words about Hundley's being held responsible if he withheld information as evidence bearing on the voluntariness of the confession instead of on the adequacy of the warning.

Neither trial defense counsel nor appellate defense counsel assailed the Article 31 and right-to-counsel warnings on the ground that these were inadequate or, incomplete. The basis for their attack is that Sergeant Luttrell's later cautioning appellant Hundley about the possibility of his being held responsible negated the earlier Article 31 and right-to-counsel warnings.

Appellate defense counsel submit that this Court's unanimous decision in United States v Williams, 2 USCMA 430, 9 CMR 60 (1953), determines the outcome of the first issue.

The suspect in *Williams* was informed that if he was guilty or if any answer tended to incriminate or to degrade him he was not compelled to answer but that he was obligated to answer all other questions that would clarify investigation and aid in the solution of the crime. This Court firmly rejected the contention that Article 31 applies only if answers would be self-incriminating. The opinion in that case emphasized the language of Article 31 that provides a *suspected* person need not make any statement. The Court found as a matter of law that Williams had not been properly warned.

If a suspect is warned that he can remain silent only if he was in fact involved in the offense of which he is suspected, that advice is improper as a part of an Article 31 warning. United States v Elliott, 15 USCMA 181, 35 CMR 153 (1964). A statement is inadmissible, despite advice to the accused of his rights under Article 31, if the accused is informed at the time of the advice that whatever he says will be held in confidence. United States v Washington, 9 USCMA 131, 25 CMR 393 (1958). If an agent gives an Article 31 warning but then leads the suspect to believe that any statement he made would not be used against him, the evidence to this effect creates an issue of voluntariness. United States v Dalrymple, 14 USCMA 307, 34 CMR 87 (1963). A statement to a suspect informing him of the probable legal consequences of information already known to the interrogators

raises no instructional issue of coercion negating advice previously given the suspect regarding his right to remain silent. United States v Howard, 18 USCMA 252, 39 CMR 252 (1969).

We turn to the record for further evidence on the adequacy of the warning. Appellant Hundley did not testify on the circumstances attending the taking of this confession. The testimony on this subject came from Sergeant Luttrell and from a Sergeant McNaney, another CID agent. Sergeant Luttrell testified that he started the interrogation by reading to Hundley a Suspect's Rights Acknowledgment/Statement, a copy of which he supplied to Hundley. Among other things, Hundley was advised that he had the right to remain silent and that he did not have to say anything to Staff Sergeant Luttrell. Hundley signed the waiver of rights and consented to the interview.

The record is imprecise on how much time elapsed between the initial Article 31 and right-to-counsel warnings and Sergeant Luttrell's reminder that Hundley might be held responsible if he were not involved but withheld information. From Sergeant Luttrell's statement that "[a]t the beginning of the interview, he denied involvement; just for a few minutes," a separation of several minutes is inferable. The record also contains this exchange:

"Q. All right. Now, after he had signed his waiver form, what was the next question you asked him?

"A. After he signed the waiver form, I believe about the next thing I asked him was, 'What happened out there?'.

"Q. And what did he say?

"A. He began by relating that he didn't know; he didn't have anything to do with it; wasn't involved in it."

What Sergeant Luttrell said to appellant Hundley on this issue was testified to by Sergeant Luttrell. Hence, this is not an instance in which conflicting testimony about what was said creates a factual issue for a correctly instructed military jury.

The Government would distinguish this case from *Williams* on the basis that the objectionable warning there occurred in the course of and as a part of the Article 31 advice, while here no issue exists about the adequacy of the first warning and the reminder or threat that is an issue came later after Hundley first denied any involvement.

Our conclusion is that Sergeant Luttrell's supplemental statements to appellant Hundley modified the terms of the original warning in an unacceptable way. The meaning of the additional advice is that "if we are wrong in suspecting you, you do not have the right to remain silent." Under the terms of Article 31, even if a suspect is not guilty, he has the right to remain silent. Article 31(b) is violated if the warning of this right is varied or qualified in such a way that the existence of the right is unclear. In this instance, what Sergeant Luttrell advised the accused later was that he did not have an absolute right to remain silent.

A suspect's right to silence under Article 31(b) does not depend upon whether he is in fact innocent or guilty; it depends upon whether he is a suspect. Our holding in this instance is distinguishable from that in United States v Dalrymple, supra, where, after flawless initial advice, a suspect was led to believe that any statement he made would not be used against him. In that case this Court held that an issue of voluntariness had been raised, requiring instructions for the guidance of the court. What was said to the suspect in *Dalrymple* did not alter the terms of the first warning. Instead the attempt to persuade him that any statement would not be used was more properly evidence of unlawful influence or inducement.

United States v Howard, supra, is different because that case held that it was not coercion within the mean-

324

ing of Article 31 for an agent to tell a suspect who had agreed to an interrogation of the probable legal consequences of information known to the police.

Another case the Government relies on is United States v Heaney, 9 USCMA 6, 25 CMR 268 (1958). But the *Heaney* opinion itself distinguishes that case from *Williams*. Heaney was not informed, as was the accused in the *Williams* case (and as was Hundley in effect), that since he denied complicity in the offenses he had no grounds for not answering the questions. The evidence in *Heaney* indicated that the accused in that instance decided to make a statement "for whatever advantage might accrue to him." 9 USCMA, at page 9.

Our decision that the warning preceding Hundley's first confession conflicted with the terms of Article 31(b) advances us to the second issue: Whether a second confession three days after Hundley's first one was a product of the first and was inadmissible for that reason.

After the first confession Hundley was confined in the base brig. Three days later he was taken to the base office of the Naval Investigative Service for further interrogation. He was informed of his rights, that the agent knew he had already given a statement, and that he did not have to talk because he had given that statement. But Hundley was also informed that his previous statement could be used against him. The first confession was lying on the table where Hundley could see it during the interview. The interrogating agent referred to the first statement in questioning Hundley and asked him to clarify some of those details. After three hours of questioning, Hundley signed another written confession that was essentially the same as the first.

Although trial defense counsel moved to suppress the second confession as a product of an illegally obtained first one, the military judge denied the motion.

The military judge gave an excellent instruction to the court members that if they had a reasonable doubt about the voluntariness of the earlier statement they could not consider the later one unless they were satisfied beyond a reasonable doubt that the improper influence of the first interview had ceased to operate on Hundley's mind when he made the second. He also provided guidelines for the court's use in making such a determination. These included: (1) the length of time that elapsed between the time of the statements; (2) whether the second statement was to different investigators; (3) whether the warning preceding the second statement was adequate; and (4) what the suspect may have been informed about the first statement at the second interview. We recognize, of course, that since the court members may have found the first statement admissible they may have not reached the issue relating to the tainting.

If the Government secures admissions without full compliance with the law and the admissions are a kind likely to produce a later confession, convincing evidence must exist that a later warning severed the presumptive influence of the first statement on the later one. United States v Bennett, 7 USCMA 97, 21 CMR 223 (1956). Whether the influence of the first statement taints the making of the second depends on the circumstances. United States v Caliendo, 13 USCMA 405, 32 CMR 405 (1962). One of the circumstances to be considered in deciding the voluntariness of a later statement is the earlier obtaining of an inadmissible statement. United States v Powell, 13 USCMA 364, 32 CMR 364 (1962); United States v Bennett, supra.

On this issue the Government contends that this Court's decision in United States v Wimberley, 16 USCMA 3, 36 CMR 159 (1966), controls. In *Wimberley,* four days elapsed between two statements; the second was made to a different agent; and the accused was thoroughly and correctly advised

of his rights. This Court held that the second statement was not inadmissible as a matter of law. So far the evidence in *Wimberley* coincides with the evidence in the instant case except here the time lapse between statements was three days instead of four.

The conditions that distinguish the cases are that here the suspect was confronted with the first ▄ statement and asked questions about it. In our view, confronting a suspect with an earlier statement and asking that he elaborate or enlarge on some of its details is more accurately a resumption of the first interrogation than an independent questioning that may be found to have an independent foundation. This circumstance, together with the elapse of only three days between the statements and the age of the suspect (17), leaves no latitude for a reasonable determination that the connection between the two statements was so attenuated that the first statement with its defect did not influence the second. United States v Powell, supra.

Our decision on the second issue is that the second statement was inadmissible as a matter of law and that it should have been excluded from consideration by the court members.

When appellate review results in a determination that pretrial confessions were improperly ad- ▄ mitted at trial, the appellate court must determine whether the Government's evidence shows that any judicial confession by an accused was not impelled by the improper admission of his pretrial statements. United States v Bearchild, 17 USCMA 598, 38 CMR 396 (1968); United States v Mackey, 21 USCMA 254, 45 CMR 28 (1972). If such a showing exists, the judicial confession overrides the prejudice otherwise resulting from the improper admission of the pretrial statements. Chapman v California, 386 US 18, 17 L Ed 2d 705, 87 S Ct 824 (1967);

United States v Kaiser, 19 USCMA 104, 41 CMR 104 (1969).

In examining the evidence in this case for such a proposition, we note trial defense counsel's statement that Hundley was testifying only because his pretrial statements had been admitted into evidence. We would expect an astute trial defense counsel to make such a representation but this does not determine the issue, as "we could hardly expect either [an accused or his counsel] to hinder his cause by acknowledging that the accused would have testified, irrespective of the use of his extrajudicial statement." United States v Mackey, supra, at page 257.

What is the other evidence? Private First Class Combs identified Hundley as a participant in the riot of July 20 and as the person who assaulted Corporals Denyer and Bankston. Parts of Combs's testimony were corroborated by several witnesses, including former Corporal Denyer, the victim of the broom stick assault, and former Sergeants Keith and Vereker and Private First Class McLaughlin, who were with Corporal Bankston who died later after being assaulted with the tree limb.

Strong circumstantial evidence implicated Hundley. This was that Hundley wore brown trousers and a gold knit shirt on the night of July 20 and that a person so clothed was one member of the group that attacked Corporal Bankston and his companions.

The defense attempted to impeach the testimony of Private First Class Combs. One of his former company commanders testified he would seriously doubt anything Private First Class Combs told him, and that he was mistrusted in the company. This company commander indicated that his opinion was based in part on information conveyed to him by his principal subordinates in the company, but the Government introduced testimony by the subordinates whose opinion he accepted and they denied being uncomplimentary to this captain about the veracity of Combs.

In two other pretrial admissions that were independent of the two confessions treated earier in this opinion, Hundley admitted "he had done a beast down,"[2] and that he had hit "a tall blond dude[3] and knocked him down with a tree limb," and "that he killed a person."[4]

The available evidence other than the pretrial statements, while exten- ■ sive, is not enough to justify our concluding that the accused would have testified even if his pretrial statements had not been admitted into evidence. For us to reach such a conclusion, the evidence would have to satisfy us beyond a reasonable doubt that the ac-cused's decision to testify was uninfluenced by the prosecution's use of his pretrial statements. The defense could have thought that Combs's credibility was questionable enough that the members of the court would not have been convinced beyond a reasonable doubt that the appellant was the person who assaulted Corporal Bankston with a log or tree limb.

We reverse the decision of the United States Navy Court of Military Review and return the record of trial to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judges QUINN and DUNCAN concur.

---

[2] The record indicates that "beast" is a term referring to Caucasians that was commonly used in Vietnam.

[3] Corporal Bankston was 6 feet 2 inches tall and had light brown— "sort of blonde"—hair.

[4] The record indicates that this statement was uttered immediately atfer the incident on July 20, 1969. Corporal Bankston did not die until July 27, 1969.